MASSON *et als.* v. UNITED STATES (No. 876).[1]

DECORATED EARTHENWARE—ROCKINGHAM WARE.

It is not shown that the importation is definitely, generally, and uniformly known as Rockingham earthenware and so constituting this a commercial designation; rather the contention that it is Rockingham ware is clearly and strongly denied by witnesses whose testimony, though negative in character, must under the circumstances be held to be competent. A witness is qualified to testify as to the commercial meaning of a trade term when he shows he has had experience in the same trade through dealing in a competing article of a similar kind. The goods were properly assessed as decorated earthenware under paragraph 93, tariff act of 1909.

United States Court of Customs Appeals, November 27, 1912.

APPEAL from Board of United States General Appraisers, G. A. 7327 (T. D. 32271).

[Affirmed.]

*B. A. Levett* for appellants.

*William C. Wemple*, Assistant Attorney General (*William A. Robertson*, special attorney, of counsel), for the United States.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

MARTIN, Judge, delivered the opinion of the court:

The issue presented in this case relates to various importations of decorated earthenware, consisting of teapots imported from England under the tariff act of 1909. The collector classified the importations

[1] Reported in T. D. 33000 (23 Treas. Dec., 502).

as decorated earthenware and accordingly assessed duty thereon at the rate of 50 per cent ad valorem under the provisions of paragraph 93 of the act.

The importers duly filed their protests against that assessment, claiming that the merchandise was Rockingham earthenware, and therefore dutiable under paragraph 92 of the act at the rate of 40 per cent ad valorem.

The protests were heard upon evidence by the Board of General Appraisers and in most part were overruled. The importers now appeal from that decision of the board.

It is conceded that the importations are decorated earthenware and that they are dutiable as such, unless they are also Rockingham earthenware, in which case that classification, being the more specific, would control the assessment. The only question, therefore, in the case is whether or not the importations are Rockingham earthenware, within the meaning of that term as it appears in paragraph 92 of the act. The following is a copy of the cited paragraphs:

92. Common yellow, brown, or gray earthenware, plain, embossed, or salt-glazed common stoneware, and earthenware or stoneware crucibles, all the foregoing not decorated in any manner, twenty-five per centum ad valorem; yellow earthenware, plain or embossed, coated with white or transparent vitreous glaze but not otherwise ornamented or decorated, and Rockingham earthenware, forty per centum ad valorem.

93. China, porcelain, parian, bisque, earthen, stone, and crockery ware, including clock cases with or without movements, pill tiles, plaques, ornaments, toys, charms, vases, statues, statuettes, mugs, cups, steins, and lamps, all the foregoing wholly or in chief value of such ware; painted, colored, tinted, stained, enameled, gilded, printed, or ornamented or decorated in any manner; and manufactures in chief value of such ware not specially provided for in this section, sixty per centum ad valorem.

It is conceded that the term "Rockingham ware" does not have any common or dictionary meaning, but the importers contend that the articles now in question have for many years been bought and sold in the trade of this country under the name of Rockingham earthenware, and have thereby acquired a commercial designation as such which is definite, uniform, and general in character throughout the domestic trade; and that this condition obtained at and prior to the enactment of the tariff act of 1909. The importers furthermore state that the merchandise in question consists of several species, among them being samian, jet, and mottled, and that these specific names were frequently used in mercantile orders and invoices, but that all of those classes belonged to the group of Rockingham earthenware, and were so known to the trade and commerce in this country, notwithstanding the frequent use of the more specific names for greater definiteness in commercial transactions. The importers do not undertake to prescribe a comprehensive and exclusive definition of Rockingham ware, by means of which all proposed articles may be adjudged for classification, but they make the concrete claim that

the actual wares now before the court had come to that designation by the usages of the domestic trade, and that they were therefore entitled to entry as such, whatever general definition of the term might thereupon be deduced from these and possibly other wares which also may be known by the same name. This position is stated in appellants' brief (p. 17) in the following words:

As before stated, the decision in this case can not rest on any definition of the term "Rockingham"; it must rest, and rest only, on the fact as to whether or not the particular articles in question were or were not so known.

This contention was submitted by the importers to the board upon testimony of two several kinds, which should briefly be reviewed in order to come to a judgment upon the record.

It may first, however, be noted that the protests involved in the hearing covered from 50 to 100 or possibly more different articles. Therefore, in the interest of clearness and brevity, various representative exhibits were first placed in evidence, consisting of certain kinds of teapots which were refused assessment as Rockingham earthenware by the collector, and certain kinds which were admitted as such. The first class comprises Exhibits 1 to 7 and also Exhibits E to M; the second class comprises illustrative Exhibits A to D; while Exhibit W was filed by the Government as a standard Rockingham ware, according to its understanding of that term. These exhibits furnished in large part the basis of the questions propounded to the witnesses. The exhibits are of different shapes and different shades of color; some are plain, others decorated, while some are entirely covered on the outside by a metal coating. In the latter case the glaze of the earthen body appears upon the bottom and inside of the piece.

The first of the two classes of testimony introduced by the importers, as above mentioned, consisted of the depositions of three English manufacturers from whom the importations had been purchased by appellants for shipment to this country, namely, George Clews, of George Clews & Co. (Ltd.), Tunstall, England; John Sudlow, of R. Sudlow & Sons, Burslem, England; and S. H. Price, of Price Bros. (Ltd.), Burslem, England.

The following extracts are taken from the testimony of witness John Sudlow, as his testimony appears in the record:

The items described in interrogatory 3 are commonly known as jet and Samian, and those in interrogatory 5 as Rockingham.

The body is the same in all three except that for the Rockingham we try to get a lighter marl than is used in the jet and Samian, though some manufacturers use the same marl for all.

The difference in the appearance of the three kinds of ware mentioned is produced by the glaze, manganese being added to color the Rockingham, cobalt for the jet, and the general white glaze for the Samian.

\*          \*          \*          \*          \*          \*          \*

In the glaze used on all of the jet, Rockingham, and Samian there is lead, flint, and stone, and this is the mixture used on the Samian.

To produce the Rockingham manganese is added to this glaze, and to produce the jet cobalt is used without manganese, proportions being occasionally varied to produce a different shade or to produce a variation in the hardness.

*    *    *    *    *    *    *

The jet is produced by adding cobalt to the general white glaze, while the Samian is produced by the general white glaze without the addition either of manganese, cobalt, or any other material.

*    *    *    *    *    *    *

Cobalt is used in producing the glaze on the ware described as jet, and manganese in the ware described as Rockingham.

The testimony of the other two English manufacturers is consistent with the foregoing. It should be observed that these witnesses did not profess to know about the commercial use made of the disputed term by the trade in this country, but their testimony simply discloses the fact that in England at the place of manufacture the wares in question are subdivided according to the glaze into three distinct classes, viz, Samian, jet, and Rockingham, each class being exclusive of the other, and that the latter term is applied to those wares only which are covered by a brown glaze produced by the use of manganese as a distinctive element in the coloring.

The second class of testimony submitted in behalf of the protests was that of the importers themselves. There were five witnesses of this class, and again it becomes necessary to quote from the record in order properly to weigh the evidence for and against the protests.

The first witness in that behalf was Robert Slimmon, for whom protestant W. H. Masson was acting as broker, and the following extracts are taken from his testimony:

Q. Now, did you ever handle ware prior to August 5, 1909, throughout the United States which was known in the United States as Rockingham ware or Rockingham earthenware?—A. Yes, sir.

Q. Did you sell that at wholesale?—A. Yes, sir.

Q. Did that term have a definite, uniform, and general understanding amongst the wholesale dealers and buyers in this country prior to August 5, 1909?—A. I should think so.

Q. Well, did it?—A. Yes. At least I had.

Q. Now, will you state whether the term Rockingham ware as used in the trade prior to August 5, 1909, included any of the articles which have been offered in evidence as Exhibits 1 to 7 and illustrative Exhibits A to D?—A. Prior to 1909, I should say yes; all except Exhibit 2, because we were not importing that, as I said. That is a new decoration or new style. Exhibit 2, I think it is.

The second witness called by the importers was William H. De Maris of the protesting firm of Maddock & Miller. By this witness the appellants established the fact that in the year 1909, prior to the enactment of the present tariff law, wares similar to all of the exhibits were invoiced to their customers in various parts of the United States as Rockingham, some being plain and some decorated.

Twelve such invoices were filed as exhibits in the case. This proof was limited to the year 1909, but the importers did not thereby mean to imply that the custom was limited to that year only. The proof was so limited in order to cover only a substantial period of time immediately preceding the enactment of the controlling tariff act.

The third witness called by the importers was John J. Miller, also of the protesting firm of Maddock & Miller, and the following extracts are taken from his testimony:

Q. In your business prior to August 5, 1909, have you handled ware known as Rockingham?—A. I have.

Q. Did that term have a well-understood trade meaning at wholesale in the United States?—A. It did.

Q. Was the meaning definite, uniform, and general amongst people in your class of trade?—A. I presume so.

Q. Referring to Exhibits E to M, which have been offered as representative of your goods under protest, will you state whether prior to August 5, 1909, these goods were sold by you under the general head of Rockingham?—A. They were.

\*      \*      \*      \*      \*      \*      \*

By Mr. PAYNE. What is that uniform and well-understood trade definition of Rockingham?—A. What is it?

Q. Yes, define it.—A. Rockingham, as I understand it, is a ware made of a common red body in England. Never heard of Rockingham made anywhere else except in England and in this country. There may be plenty made elsewhere, but I don't know anything about it.

Q. Is that the complete definition of the trade as you understand the trade understanding, without limitation?—A. My definition of Rockingham would be ware made of a common red body.

Q. That you understand is the trade understanding?—A. I think that is the trade understanding.

Q. You mean by that all earthenware made of a body of common red clay is embraced within the trade understanding of the term Rockingham ware?—A. Not necessarily.

Q. What limitation is there to that definition?—A. The limitations in that case are like the limitations in a good many other cases, very hard to define.

\*      \*      \*      \*      \*      \*      \*

Q. Your idea of what the trade understands by the term?—A. I can only define my own idea. I can not define what somebody else might think on a given subject. We can only see things through one's own eyes. My interpretation is this——

Q. Before you give your interpretation let me ask you one question. Do you know what that uniform and definite trade understanding of the term is?—A. I think I do.

Q. Now I want you to give that, not your own individual opinion.

Judge SOMERVILLE. You can give your own individual opinion if it is recognized by the trade.

WITNESS. My individual idea is that the opinion I have is the general trade opinion. I individually think so because I am in the trade.

Q. All right. Now give us that definition, please.—A. Well, Rockingham ware is ware that is made of a common red body. That is as near as I can define it.

Q. Has the glaze on the body anything to do with determining whether it is Rockingham or not?—A. No, sir.

Two additional witnesses, namely, Edward F. Anderson and Bertie Rosenfeld, both members of protesting firms, were the only other witnesses called by appellants in the case. Both of them testified

that the importations were commercially known as Rockingham ware. When Mr. Anderson was asked for a definition of the term he answered as follows:

Rockingham ware is as thoroughly known in the trade as anything possibly can be, and it requires no definition, because everyone that is in the trade knows it to be Rockingham. I only know it as a trade proposition, not as a manufacturer at all.

When Mr. Rosenfeld was asked for a definition of Rockingham ware he answered:

Well, this class of teapots; * * * teapots as a rule coming from England; * * * teapots of this character here.

Q. Made of what?—A. I don't know exactly how these things are made, because I am not sufficiently enough informed on the technical part. * * *

Q. That is not what I asked you. I am asking you whether you know whether the general understanding of the trade limits the term Rockingham ware to a particular glaze or ware made out of a particular kind of clay.—A. I don't know.

By Judge SOMERVILLE. Is the term Rockingham confined to any particular colors?— A. I don't know that, either.

This is a brief but fairly complete outline of the testimony submitted to the board by appellants in behalf of the claim that the importations were entitled to the name of Rockingham earthenware, according to the commercial meaning of that term as used in the trade of this country.

On the other hand, the contention of the Government is that Rockingham ware, as the term was and is used in the domestic trade, is a variety of earthenware which is distinguished by its glassy, brown color, produced by the use of manganese in the glaze, and that the great majority of the items contained in the importations lack such a glaze, and therefore do not come within that definition. The Government claims that Samian and jet ware are produced by glazes which contain no manganese, and that they are separate and independent kinds of ware, and are not included within the tariff classification of Rockingham earthenware.

In support of their contention the Government called as witnesses six domestic manufacturers of similar wares and one importer of such wares. The manufacturers all testified that, according to its commercial usage in the trade of this country, the term Rockingham ware included only such earthenware as was covered by a brown glaze in the coloring, of which manganese was the distinctive constituent, and in this statement they were substantially supported also by the importer who was called by them.

A few extracts from the testimony of some of these witnesses will here be copied:

Henry Blunt, of the Edwin Bennett Pottery Co., Baltimore, Md.:

By General Appraiser HAY. Do you know the origin of the word Rockingham as applied to the ware?—A. I know it as gained from historical books only. Why, it is made at a small village in England—originally made at a small village in England— some two or three hundred years since, and the pottery was patronized by the Marquis of Rockingham, and from that the ware was called Rockingham. In distinction,

speaking of this as a distinction (referring to Exhibit 5), this ware was introduced into England hundreds of years before Rockingham ware was ever invented.

\*      \*      \*      \*      \*      \*      \*

Q. So far as England is concerned; but so far as America is concerned, how are you able to state those were known as Rockingham? Is it based upon your experience in selling them under the name of Rockingham?—A. Yes; the reason for it is this, that the manufacture of Rockingham ware was transferred from England to America, or to the States, by those that were engaged in the manufacture of Rockingham ware in England, and consequently making the same goods in the States as they made in England they took the same name.

\*      \*      \*      \*      \*      \*      \*

Q. And that is a certain limited class?—A. Yes; we have got three classes of goods here. We have got Samian, jet, and Rockingham. Now, the dipper has three tubs of glaze. This has got Samian glaze in it, this has Rockingham glaze, and this is jet. This is for illustration. He has got a piece of ware in his hands. If he puts it into this glaze it is Samian; if he dips it into this glaze it is Rockingham. The same piece of goods, if he puts or dips it into the jet it is jet.

\*      \*      \*      \*      \*      \*      \*

By General Appraiser HAY. Is the use of manganese as a coloring matter for the glaze essential in the manufacture of Rockingham ware?—A. Yes, sir.

Q. Is all ware glazed with a glaze that is colored with manganese Rockingham ware?—A. Yes.

\*      \*      \*      \*      \*      \*      \*

Q. Wherever manganese is not used it is not Rockingham ware? That is the test, is it not, that you make?—A. Well——

Q. Wherever it is colored by something else than manganese it is not Rockingham ware?—A. It is not Rockingham.

George C. Thompson, of the A. C. C. Thompson Pottery Co., East Liverpool, Ohio, testified in part as follows:

Q. What is the distinguishing feature about a piece of Rockingham that distinguishes it from any other ware?—A. A piece of Rockingham is brown glazed ware the color of which is produced by the use of manganese.

Q. Is that the usual way of obtaining it?—A. Yes; that is the only way I know to obtain it.

William Burgess, manufacturer of pottery wares, Trenton, N. J., testified in part as follows:

Q. Tell the board what is meant by the term Rockingham as understood in the trade.—A. Rockingham ware is ware generally made on the cheapest body, because the body is to be covered with a brown glaze; it is made largely in England of a brown body, also white body, and also yellow body. In this country it is made almost entirely on a yellow or buff body, in all cases covered with a brown glaze; the principal coloring matter generally used is manganese in combination with other materials.

It is not necessary to quote further from the testimony of the Government's witnesses; it is sufficient to say that the witnesses agree upon the definition already given as the commercial meaning of the disputed term as used in the trade of this country.

The importers' counsel moved to strike out the testimony of certain of the witnesses for the Government, because of the fact that they had not dealt in the imported wares in question but only in similar wares of domestic manufacture, the contention of counsel in that behalf being that only such witnesses as had dealt in imported

wares similar to those in controversy were qualified to testify concerning the trade designation of such articles.

This motion was not sustained by the board. It was rightly held in effect by the board that a witness might obtain a competent knowledge of the commercial meaning of a trade term by means of his experience in the same trade, obtained by dealing in a competing article of a similar character.

Upon the testimony above outlined the board found as follows:

The testimony, we think, conclusively, certainly by a fair preponderance, shows that the term "Rockingham ware" originally applied to a certain class of cheap earthenware manufactured in England, and, in more recent years, in the United States; that it is generally made of a reddish clay body, but sometimes of a yellow and less frequently of a white clay body; that this body is covered *with a brown glaze, the chief coloring ingredient of which is manganese.* Being guided by this testimony, we reach the conclusion that it is the glaze with which the body of the ware is covered that gives to it its distinctive name and character.

In accordance with this finding the board divided the importations into those which were entitled to entry as Rockingham earthenware, under the foregoing definition, and those not so entitled, and in part sustained and in part overruled the protests.

It is stated by counsel for the importers that in its separation of the importations the board, notwithstanding its announced rule, in some instances admitted as Rockingham ware certain articles which did not come within the approved definition of such ware. The decision of the board, however, makes no mention of any such exceptions, but in terms sustains the protests only so far as the articles concerned conform to the given definition. If, therefore, any other articles, not coming within the approved definition, were nevertheless admitted as Rockingham ware, it was not an exception to the rule or an intended violation of it, but only a mistaken application of it to individual articles, and of this of course the importers can not complain.

The subject of Rockingham earthenware has a judicial history which, though brief, may well be adverted to.

In T. D. 14825, February 28, 1894, in the case of the Anglo-American Crockery & Glassware Co., the board, dealing with an importation of Rockingham earthenware, said:

The same is earthenware, the interior and exterior surfaces of which are finished with a glazing of a deep brown color of glassy appearance and great brilliancy. It is earthenware tinted or stained.

It may be noted that the importation involved in the foregoing decision was entered under the tariff act of 1890, and that Rockingham earthenware was not specifically enumerated therein.

In T. D. 17728 of December 14, 1896, in the case of Edward Boote the following finding was made by the board upon the testimony:

This ware, according to the evidence in the case, is manufactured by first molding the articles from clay and firing the same to produce the biscuit ware. This biscuit ware is then coated with a mixture of calcined feldspar, ground flint, and manganese,

and the articles when so coated are called "enamel painted," according to the testimony of the importer.

The ware, after being so coated, is again fired and the coating fused, producing a brilliant glassy dark brown or black enameled surface to the ware, differing entirely in character, color, density, and material from the clay body. It is known specifically in trade as brown Rockingham ware, and is earthenware enameled and tinted, and is not the class of ware commercially known as common brown earthenware.

It may be observed that in the foregoing decision the color of Rockingham ware is spoken of as dark brown or black. This black, however, should not be confused with the black color produced by the use of cobalt, since that substance is not mentioned in the decision as one of the color ingredients. Calcined feldspar, ground flint, and manganese are named as the sole elements producing the Rockingham glaze. It is shown by the testimony in the case now at bar that these elements sometimes produce different shades of color, resulting from the conditions of the firing and the proportions of the ingredients.

In T. D. 21320 of June 22, 1899, in the case of Wilfred Schade & Co., the board gave the following description of Rockingham ware:

It is the highly glassy, tinted glaze that gives Rockingham ware its distinctive name and character. It may be decorated or tinted earthenware, but so long as it has only the Rockingham glaze it is covered by the special provision for Rockingham earthenware.

The case just cited arose under the tariff act of 1897, in which for the first time Rockingham earthenware was specifically enumerated, by a provision in paragraph 94 for Rockingham earthenware, not decorated. The foregoing decision held that the glaze upon the imported articles was an inherent element of Rockingham ware, and not a decoration of it within the meaning of the paragraph. Such ware was therefore admitted as Rockingham earthenware, not decorated.

In Notes on Tariff Revision (p. 102) the following memorandum appears:

Rockingham ware is the name given the brown ware familiar in teapots. The color is produced by manganese (par. 607). The name is derived from the English town in which it was originally made.

It will be seen that the conclusion reached by the board in the present case is consistent with the two decisions above cited, and the interpretation of the same term appearing in the act of 1909, now, however, without the express restriction "not decorated," should take into due account the preceding decisions, wherein the article in question was described or its name defined. (T. D. 30290.)

The extracts from the testimony, above given, were designed to take the place in the present decision of a résumé of the evidence in merely general terms. It may therefore now briefly be said that this court is far from the conviction that the board's decision is unsustained by the testimony; to the contrary, in the opinion of the court, the overweight of the evidence is with the finding of the board. There is an uncertainty which characterizes the testimony

submitted by the appellants, which makes it fail as full proof of a "definite, uniform, and general" commercial designation of the term in question. The appellants indeed all testified that the disputed term had a definite, uniform, and general commercial meaning in the domestic trade, nevertheless they themselves were quite unable to express any such meaning in words. On the other hand, the opposing evidence submitted by the Government was equal in character, clearer in terms, and apparently more probable than the testimony offered by the importers.

It is true that the testimony of the Government's witnesses was to a certain extent negative in character. This, however, must always be the case where a denial is made of a proposed commercial designation. In such case the proof in denial of the claim must necessarily consist of the testimony of witnesses who have not observed the alleged use of the term by the trade, but who in the natural course of events would have observed such use had it actually existed in the trade. The force of such negative testimony must depend in each case upon the extent of the acquaintance of the individual witness with the transactions of the trade in question or of his participation therein. And in that connection it may well be believed that those persons engaged in the manufacture and sale in this country of certain kinds of ware could and probably would become familiar with the terms used by the trade in transactions affecting competing wares of a similar character imported from a foreign country.

In conclusion, the court finds that the decision of the board was sustained by competent and sufficient evidence, and it is therefore *affirmed.*