JAMES F. WHITE & Co., *v.* UNITED STATES (No. 3888)[1]

United States Court of Customs and Patent Appeals, December 2, 1935

*Siegel & Mandell* (*Allan R. Brown* of counsel) for appellant.
*Joseph R. Jackson,* Assistant Attorney General (*Charles J. Miville* and *Ralph Folks,* special attorneys, of counsel), for the United States.

[Oral argument October 9, 1935, by Mr. Brown and Mr. Jackson]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

LENROOT, Judge, delivered the opinion of the court:

This appeal involves certain merchandise the subject of fourteen separate importations from Dundee, Scotland, the first of said importa-

[1] T. D. 48061.

tions being entered September 22, 1930, and the last on May 25, 1931, the port of entry being New York. Said merchandise was classified by the collector as jute twine "polished, or otherwise treated," and assessed with duty at the specific rate of 3½ cents per pound, plus 2 cents per pound on the ground that the jute twine in question was "bleached, dyed, or otherwise treated," under the provisions of paragraph 1003 of the Tariff Act of 1930, the pertinent portions of which paragraph read as follows:

PAR. 1003. * * * twist, twine, and cordage, composed of two or more jute yarns or rovings twisted together, the size of the single yarn or roving of which is coarser than twenty-pound, 3½¢ per pound; * * * and in addition thereto, on any of the foregoing twist, twine, and cordage, when bleached, dyed, or otherwise treated, 2 cents per pound.

Protests were filed by the importer against the action of the collector in all of said cases, claiming that the merchandise was not assessable with the additional duty of 2 cents per pound on the ground that it was not bleached, dyed, or otherwise treated, but that it was properly dutiable at only 3½ cents per pound under said paragraph 1003.

The cases were considered together by the United States Customs Court, Second Division, and said protests were overruled, Presiding Judge Tilson dissenting. A motion for rehearing in said court was denied and appeal was taken to this court. All of the protests in question are before us in this appeal.

The contention of appellant here is stated in the following excerpt from the brief filed in its behalf:

Appellant contends that the additional duty of 2 cents per pound is not applicable because the twine has been subjected only to the processes necessary to produce the jute twine and has not been bleached, dyed, or otherwise treated. The jute twine in question is in a polished condition, but the record shows clearly that the polishing is one of the processes necessary to produce the twine and that it has not been bleached, dyed, or otherwise treated.

In other words, appellant contends that the merchandise in question did not become twine until the polishing operation was applied, and that said polishing operation therefore did not constitute the merchandise as having been "bleached, dyed, or otherwise treated."

The only testimony in the case consists of the answers of one William Christie Gow, of Dundee, Scotland, to interrogatories propounded to him pursuant to a deposition taken by the American consul in Dundee under a commission issued for the purpose by the United States Customs Court. From said deposition it appears that the witness is "Twine Salesmanager" with the firm of Jute Industries, Ltd., of Dundee, Scotland, which firm manufactured the twine here in question; that he had been with said firm 37 years; that he was familiar with the particular merchandise involved in said importations; that he was familiar with the processes of manufacture of said

merchandise; that the making of twine had been his study since he was appointed salesmanager in 1905, and that it is all done under his personal supervision. After detailing the steps necessary to convert raw jute into jute yarn, the witness testified as follows:

\* \* \* These spools [of yarn] are now placed on a twisting machine and two or more threads are twisted together onto a bobbin. These bobbins are then placed on a polishing machine, running first through a mixture of starch, then onto large cylinders, steam heated, which dry the twine. At the same time smaller rollers running at a high speed and covered with wax make the polishing process complete. The polishing machine leads this twine onto bobbins which are then taken to a balling machine which in turn makes this twine into a ball, which is the last process. The balling is actually done by a machine but the band round the waist of the ball is put on by hand. These balls are now packed in paper parcels of six or more balls, then packed in cartons or bales ready for shipment.

\* \* \* \* \* \* \*

10. Q. Has the twine aforesaid been bleached, dyed, or otherwise treated than above indicated by you?—A. No.

11. Q. What is the relation from the manufacturer's standpoint between jute twist and jute twine?—A. Jute twist is the twisting of two or more threads together, but these threads have afterwards to be polished before they become twine. The twist is not twine until it is polished, and after it is polished it gets no further treatment.

12. Q. In your experience what other treatments have been given to jute twist, twine and cordage besides bleaching and dyeing?—A. Tarred, greased, oiled, waterproofed, or made non-inflammable.

13 Q. Are any of these treatments essential in the manufacture of a finished twine?—A. No.

14 Q. State which of the processes which you have enumerated in your answer to interrogatory No. 8 are not essential in the manufacture of twine.—A. All those in No. 8 are essential.

15 Q. State whether unpolished twine is an intermediate product occurring in the process of manufacture or whether it is an ultimate product. If it has any ultimate use state what such use is and its proportionate employment as compared to polished twine.—A. It is an ultimate product if after twisting of two or more threads together it is to be sold as twist. There is a certain market for twist for garden and agricultural purposes, also for the sewing of fertilizer sacks. For these purposes the demand is probably not more than 5-10% of the polished twine.

### Cross-Interrogatories.

1 Q. What is the purpose of polishing jute twine?—A. We do not polish Jute Twine. We polish Jute Twist to make it into Jute Twine. Jute Twist is polished to give it greater strength to give it a better appearance for selling purposes, and to make it more convenient for commercial purposes.

2 Q. Is it essential or necessary that starch, glue, or any other adhesive substance be mixed with the yarns before or after twisting to produce jute twine?—A. It is essential to use starch, glue or some other adhesive substance after the twisting process to make Jute Twine.

3 Q. What is the natural color of jute twine?—A. The natural color of Jute Twist varies from white to dark grey, but the polishing process may alter the shade a little according to the starch mixture used.

4 Q. Is it possible to produce a polished jute twine without any further process after the jute is spun and twisted?—A. No. It must be polished (after being spun and twisted) to make it into Twine.

\*     \*     \*     \*     \*     \*     \*

6 Q. What is the name given to a jute product the fibers of which have been spun into yarns and these yarns twisted together into two or more ply?—A. Jute Twist.

7 Q. Is it not a fact that after the process of twisting two or more yarns into twine this twine may be and is reeled or put up into balls and sold as jute twine?— A. No. After the process of twisting the material is called Twist, and in such form may be reeled and balled, but it would then be sold as Twist, not Twine.

It will be observed from the foregoing that the polishing process described by the witness was the last treatment that the involved merchandise received in its manufacture, and that the witness stated that this process was necessary to convert twist into twine.

The trial court came to the conclusion that the involved merchandise was either polished twine or polished twist, and overruled the protests. We are likewise of the opinion that, within the meaning of paragraph 1003, the involved merchandise is either polished twine or polished twist, and that the polishing process is embraced in the words "otherwise treated" in said paragraph. We are of the opinion that Congress, in enacting paragraph 1003, never intended that polished twist should be regarded as twine, or that all jute twine is necessarily polished.

We have often said that the master rule of construction of tariff acts is so to interpret them as to carry out the legislative intent, subject to another rule that, unless the statute be ambiguous, the intent must be ascertained from a construction of the language used therein.

In view of the fact that the common meaning of "twine," as found in standard dictionaries, includes twist, and in view of the fact that it must be presumed that Congress, in using the words "twist" and "twine" in the same provision at the same rate of duty, did not regard the words as synonymous, we are warranted in turning to the legislative history of the provision to assist us in determining the intent of Congress in its enactment.

In the Summary of Tariff Information, 1929, prepared by the Tariff Commission for the use of the Committee on Ways and Means of the House of Representatives in preparing the bill which finally became the Tariff Act of 1930, we find the following at page 1622:

Twist, twine, and cordage are made by doubling or cabling single yarns. Jute twist is a term usually employed for jute ply yarns, intended for weaving. *Jute twines are harder twisted ply yarns which are used most extensively in tying up bundles of medium bulk.* They are commonly called after the trade that uses them—fodder twine, for tying up fodder; paper makers' twine, for tying up bundles of paper; box twine, for bundling box shooks, etc. \* \* \* (Italics ours.)

From the foregoing we are of the opinion that in the provision for "twist, twine, and cordage" in paragraph 1003 of the Tariff Act of 1930, Congress intended to distinguish twine from twist only in that twine was considered to be an article composed of two or more jute yarns "harder twisted" than the yarns composing the article known as twist, and it did not contemplate that a polishing process was necessary to convert twist into twine, or that such a process would convert twist into twine, as contended for by appellant.

In this view of the case, the merchandise here involved was, in a tariff sense, either twist or twine, depending upon the hardness of the twist and not upon polishing. If before the polishing process was applied the article was lightly twisted it was twist within the intent of Congress before the treatment of polishing; and if the article was "harder twisted" before the polishing process was applied, it was twine within the intent of Congress before the treatment of polishing.

There is nothing in the record before us to indicate the hardness of the twisting, and we are unable to ascertain from an inspection of the samples before us the degree of the hardness of the twisting. We are therefore in accord with the view of the trial court that the involved merchandise is either polished twine or polished twist within the meaning of the words "twist" and "twine" as used by Congress.

We would observe in this connection that the merchandise was manufactured in Scotland, and the only evidence in the record is testimony as to the processes employed by the manufacturer there in manufacturing the involved merchandise, and the understanding of the manufacturers in that country of the terms "twist" and "twine."

It may be that in Scotland polished twist is commercially known as twine and that the trade there does not regard as twine any article of jute that is not polished twist; but if there be any such commercial understanding of the terms "twist" and "twine" in Scotland, that fact could not affect the classification of the involved merchandise upon being imported into the United States. *Masson et al.* v. *United States*, 3 Ct. Cust. Appls. 420, T. D. 33000.

Furthermore, conceding that the involved merchandise is included within the common meaning of "twine," both in Scotland and the United States, our conclusion nevertheless is that Congress intended, in said paragraph 1003, to distinguish twine from twist only in respect to the hardness of the twist, and did not contemplate that a polishing process converted twist into twine, but intended that twine manufactured by such process should fall under the provision for twist and twine "otherwise treated."

The legislative intent is the lodestar of judicial decision. *Schwabacher & Co., Inc.* v. *United States*, 22 C. C. P. A. (Customs) 496, T. D. 47484.

For the reasons stated herein, the judgment of the United States Customs Court is *affirmed*.

GRAHAM, Presiding Judge, and GARRETT, Judge, dissent.