UNITED STATES *v.* INTERNATIONAL CLEARING HOUSE OF NEW YORK (No. 3967)[1]

United States Court of Customs and Patent Appeals, June 17, 1936

*Joseph R. Jackson*, Assistant Attorney General (*William Whynman*, special attorney, of counsel), for the United States.

*Brown & Carter* (*Allan R. Brown* and *Fred J. Carter* of counsel) for appellee.

[Oral argument April 9, 1936, by Mr. Whynman and Mr. Brown]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court holding certain knitted wearing apparel, such as negligees, bed jackets, scarfs, and shawls, dutiable at 50 cents per pound and 50 per centum ad valorem under paragraph 1114 (d) of the Tariff Act of 1930, as claimed by the importer, rather than as laces or lace articles under paragraph 1529 (a) of that act, as assessed by the collector at the port of New York.

---

[1] T. D. 48416.

Paragraph 1114 (d) and the pertinent part of paragraph 1529 (a) read:

PAR. 1114. (d) Outerwear and articles of all kinds, knit or crocheted, finished or unfinished, wholly or in chief value of wool, and not specially provided for, valued at not more than $2 per pound, 44 cents per pound and 45 per centum ad valorem; valued at more than $2 per pound, 50 cents per pound and 50 per centum ad valorem.

PAR. 1529. (a) Laces, lace fabrics, and lace articles, made by hand or on a lace, net, knitting, or braiding machine, and all fabrics and articles made on a lace or net machine, all the foregoing, plain or figured; lace window curtains, veils, veilings, flouncings, all-overs, neck rufflings, flutings, quillings, ruchings, tuckings, insertings, galloons, edgings, trimmings, fringes, gimps, and ornaments; braids, loom woven and ornamented in the process of weaving, or made by hand, or on a lace, knitting, or braiding machine; and fabrics and articles embroidered (whether or not the embroidery is on a scalloped edge), tamboured, appliquéd, ornamented with beads, bugles, or spangles, or from which threads have been omitted, drawn, punched, or cut, and with threads introduced after weaving to finish or ornament the openwork, not including one row of straight hemstitching adjoining the hem; all the foregoing, and fabrics and articles wholly or in part thereof, finished or unfinished (except materials and articles provided for in paragraph 915, 920, 1006, 1111, 1504, 1505, 1513, 1518, 1523, or 1530 (e), or in Title II (free list), or in subparagraph (b) of this paragraph), by whatever name known, and to whatever use applied, and whether or not named, described, or provided for elsewhere in this Act, when composed wholly or in chief value of filaments, yarns, threads, tinsel wire, lame, bullions, metal threads, beads, bugles, spangles, or rayon or other synthetic textile, 90 per centum ad valorem.

It is conceded by counsel for the parties that the sole question in the case is whether the involved articles are laces or lace articles, within the meaning of the provisions of paragraph 1529 (a), *supra*, and that if they are, they are more specifically provided for therein than as knitted outerwear under paragraph 1114 (d), *supra*.

In view of its extensive analysis of the evidence, and its conclusion with regard thereto, we deem it advisable to quote rather fully from the trial court's decision:

The record conclusively establishes that the merchandise here involved was made on a knitting machine, and counsel for both parties have agreed that it is made of wool valued at more than $2 per pound.

The record in this case consists of the testimony of eighteen witnesses, twenty exhibits, and numerous illustrative exhibits, the testimony of one witness being taken by interrogatories. In view of the number of witnesses testifying, we shall not undertake a detailed discussion of all their testimony.

George Henry Hurt testified that he was the practical manager for the firm which manufactured the merchandise in question; that his knowledge and experience in the manufacture of knit goods and of laces was a life knowledge, that he had been in the hosiery trade for the past forty-six years in and near Nottingham, England. After further qualifying himself as to laces and the machines upon which they are made, he stated that the merchandise in question was made on a converted hand stocking machine, that no Jacquard or shuttle was used, and then stated positively that it was not possible to produce a lace upon said machine. This witness also stated that the merchandise was made on a bearded needle

hosiery hand frame machine, manually operated, and that it was impossible to make lace on such a machine.

Another witness, who was exceptionally well qualified, testifying for the plaintiff, was Mr. Weutlinger. He was graduated from the Zurich Textile School, Zurich, Switzerland, with the degree of Textile Engineer, and from 1913 to 1926 was connected with some of the leading fabric manufacturers of this country. From 1926 to date he has been in business for himself as a consulting textile expert, and has had as his clients many of the leading textile manufacturers of this country, and has occasionally been employed as a textile expert by the United States Government in customs cases. After giving these qualifications the witness stated that the merchandise here involved was not laces. After being thoroughly qualified this witness also stated that the merchandise in question was not made on a lace machine, but that it was made on a knitting machine, and that "these fabrics are all typical and true knit fabrics and do not resemble, in any way or form, lace."

  *    *    *    *    *    *    *

Counsel for the defendant had admitted in evidence, as Illustrative Exhibit "FF" for identification, a scarf produced by his witness, Stoppard, for the purpose of showing that on the knitting machines used by the witness any kind of material can be used and produce a lace. This same witness, upon interrogation as to whether Illustrative Exhibit "FF" for identification, was any particular kind of scarf, stated, "No, it is just a scarf. Just a wool knit scarf."

Witness Stoppard, after testifying that he had made the articles represented by Illustrative Exhibits "DD" to "HH", inclusive, over a period of twenty-one years, and had sold them to the wholesale trade throughout the United States, when asked, referring to his customers, "What do they order; what do they call it?", replied: "they simply say we want so many wool scarfs, so many rayon scarfs or cotton scarfs, or whatever the fabric happens to be." He also testified that Illustrative Exhibit "HH" was ordered as dress goods, but upon being asked, "What would they tell you?", he stated, "They just tell me lace wool dress goods of a specific material and that has to be cut out and made up." But upon cross-examination, however, he testified that customers in ordering merchandise like Illustrative Exhibits "DD" to "HH", inclusive, would just give him the number, the item number, or the pattern number, and say whether they wanted wool, or cotton, or rayon, or some other material. It would appear from the above that there was not, even in the mind of the witness, any general, uniform, or definite term by which said merchandise was known.

This same witness, Stoppard, after testifying positively that the twenty samples in this case were wool lace, gave his definition of the term "lace" as "any knitted fabric with holes in it", regardless of how the holes are grouped or produced, and whether fancy or otherwise.

Witness Schloss, after stating that he had sold merchandise like and similar to that represented by the exhibits in this case, prior to June 17, 1930, testified that generally, definitely, and uniformly such merchandise was known as "wool lace", so far as he knew. However, when he was examined further concerning Illustrative Exhibit "FF" he stated that he could not say that every time a man spoke to him that he called this a lace scarf; that his customers would simply say they wanted a scarf, and sometimes they would say lace scarf, and that he, being a lace manufacturer, interpreted that to mean they wanted a lace scarf. He also stated that "on the whole" he agreed with the definition of the term lace as given by the witness Stoppard; that he would call drawn-work lace, and also that he would call plain veiling of the ordinary weave, without any holes, lace.

  *    *    *    *    *    *    *

The testimony of George Henry Hurt, who supervised the manufacture of the merchandise in question, and who has spent his entire business life of some forty-five years in the knitting and lace business in the lace center of the world, is not to be ignored in deciding this case. As hereinbefore set out, the testimony of this witness is to the effect that the merchandise in question was made on a manually operated converted hand stocking machine and that no *Jacquard or shuttle* was used, and that it was impossible to produce lace upon said machine. The record fails to disclose that any of the other witnesses who testified in this case had any knowledge of the machine upon which this merchandise was produced, or whether or not said machine was capable of producing lace. Certainly such clear and positive testimony is not overcome by the testimony of the defendant's witnesses to the effect that they produce merchandise which they denominate as lace upon a knitting machine in this country.

Counsel for the defendant made no attempt to compare the manually operated converted hand stocking machine, without a Jacquard or shuttle, upon which the imported merchandise was produced, with the knitting machines upon which its witnesses testified they produced lace. Neither is it shown whether machines operated by the witnesses for the defendant, upon which they produced what they have called lace, did or did not have a Jacquard or shuttle. The defendant's witness, Stoppard, admitted that he had never produced lace on a knitting machine while he was in the lace business in England.

While there is no testimony to that effect in this record, the authorities we have examined on the subject clearly indicate that certain knitting machines are not capable of producing lace under any circumstances, while other knitting machines are capable of producing lace by means of a shuttle or Jacquard attachment, and that these same machines, with the shuttle or Jacquard attachment removed, are not capable of, and will not produce lace. In this connection it should be remembered that the machines upon which this merchandise was produced are manually operated.

While we do not wish to be understood as basing our conclusion entirely upon the testimony of witness Hurt, that the merchandise in question was made on a manually operated converted hand stocking machine and that no Jacquard or shuttle was used, and that it was impossible to produce lace upon said machine, we do feel that such clear and positive testimony placed upon the defendant the onus of establishing the incorrectness of this testimony, if such testimony were not correct. Testimony that *so-called lace is produced upon a knitting machine in this country we do not deem sufficient to refute the above testimony, when no effort is made to show any similarity or dissimilarity between said machines.* [Italics ours.]

The definition of the term "lace" given by the defendant's two witnesses, hereinbefore set out, to the effect that it embraced and included "any knitted fabric or articles with holes in it, irrespective of how the holes are produced, and whether fancy or otherwise", is at such great variance from the definition of that term as given by the lexicographers and other authorities on the subject, as to incline us to give less weight to their testimony, not only as to their definition of the term "lace", but also to other testimony given by these witnesses. To say that the term "lace" embraces and includes "any fabric or articles, knitted, with holes in it, irrespective of how the holes are produced, and whether fancy or otherwise", comes very close to bordering on the absurd.

\* \* \* \* \* \* \*

All of the samples of the involved merchandise, as well as the illustrative exhibits, are now before us and have had our careful inspection and examination. It is true that some of the imported merchandise does have what some of the witnesses were pleased to call a "lacy" effect, but the provision in said paragraph

1529 (a) is not for fabrics and articles having a "lacy" effect, made by hand, or on a lace, net, knitting, or braiding machine, but is for *"laces, lace fabrics, and lace articles"*, made by hand, or on one of said machines.

After a careful consideration of the entire record upon which these suits have been submitted for decision, and also of the briefs filed by counsel, we find that the plaintiff has established that the classification by the collector is in error and that the claim made by the plaintiff is correct. We therefore hold all the merchandise on the invoices covered by the suits listed in schedule A, hereto attached and made a part thereof, which was assessed with duty at 90 per centum under paragraph 1529 (a) of the Tariff Act of 1930, as wearing apparel composed of wool lace, or as wearing apparel in part of lace, to be properly dutiable at the rate of 50 cents per pound and 50 per centum ad valorem under paragraph 1114 (d) of the Tariff Act of 1930, as outerwear and articles of all kinds, knit, wholly or in chief value of wool, and not specially provided for, as claimed by the plaintiff.

We do not wish to be understood as setting down a definite and positive definition of what is, or is not, lace on this record, but we simply hold that the plaintiff has overcome the presumption of correctness attaching to the action of the collector, and has established the correctness of its claim.

It is the contention of counsel for the Government that the testimony of the witnesses for appellee, relied upon by the trial court, is of such character as to have no probative force. It is suggested that the testimony of the witness Hurt, whose testimony is given considerable prominence in the decision of the trial court, is without probative force, because it relates to the common or commercial understanding of the terms "lace" or "lace articles" in England, rather than to the meaning of those terms as used in the United States, and, in support of their proposition, cite the case of *James F. White & Co., Inc.* v. *United States*, 23 C. C. P. A. (Customs) 224, T. D. 48061, wherein this court stated that the commercial understanding of a tariff term in a country of exportation was without probative force in a determination of the dutiable classification of the merchandise involved. We there said:

We would observe in this connection that the merchandise was manufactured in Scotland, and the only evidence in the record is testimony as to the processes employed by the manufacturer there in manufacturing the involved merchandise, and the understanding of the manufacturers in that country of the terms "twist" and "twine."

It may be that in Scotland polished twist is commercially known as twine and that the trade there does not regard as twine any article of jute that is not polished twist; but if there be any such commercial understanding of the terms "twist" and "twine" in Scotland, that fact could not affect the classification of the involved merchandise upon being imported into the United States. *Masson et al.* v. *United States*, 3 Ct. Cust. Appls. 420, T. D. 33000.

Furthermore, conceding that the involved merchandise is included within the common meaning of "twine," both in Scotland and the United States, our conclusion nevertheless is that Congress intended, in said paragraph 1003, to distinguish twine from twist only in respect to the hardness of the twist, and did not contemplate that a polishing process converted twist into twine, but intended that twine manufactured by such process should fall under the provision for twist and twine "otherwise treated."

Counsel for the Government further contend that the testimony of the witness Weutlinger, a consulting textile specialist, textile engineer, and graduate of the Zurich Textile School in Zurich, Switzerland, who has been engaged as a textile engineer in the United States since 1913, and has represented the United States Government in customs cases as a textile expert, is without probative force, due to the fact that he stated in substance that, although laces might be made of wool, he had no knowledge of their having been made on a knitting machine, whereas the record affirmatively establishes, and it is conceded by counsel for appellee, that wool laces can be and are made on knitting machines.

Counsel for each of the parties criticize the evidence produced by the other. We are not disposed to disagree entirely with either of them.

It is true, as argued by counsel for the Government, that the testimony of the witness Hurt necessarily involves the common meaning of the word "lace," although he was not asked to define either the common or commercial meaning of that term, because, after fully describing the machine on which the involved articles were made, and stating that it was a "converted hand stocking machine," that no Jacquard attachment or shuttle was used thereon, and that "the pattern is produced by using a set of points, taking the stitches off the needles and transferring them to the needles to form the pattern desired," he stated that it was impossible to make lace thereon.

We deem it unnecessary to decide what weight should be given the testimony of a qualified lace expert in England as to the common meaning of the term "lace." (No attempt was made to prove commercial designation.) It is here sufficient to say that the witness Hurt fully described the machine upon which the involved articles were made, and stated that lace could not be made thereon. Counsel for the Government did not see fit to attempt to meet that testimony, other than to produce the testimony of two witnesses who stated in substance that the involved articles were lace. One of the witnesses testified that, although the involved articles were lace, they were the poorest quality he had ever seen made on a knitting machine of any kind. Following that statement, a most interesting colloquy occurred, which we quote:

Judge TILSON. They are almost so poor they are not lace?

The WITNESS. They are all pretty bad.

Mr. WHYMAN. I do not know how to take your Honor's question. The question has stumped me.

We have considered the criticisms and contentions made by counsel for the Government. However, we are not unmindful of the fact

that the testimony of the Government's witnesses is open to attack, as suggested in the decision of the trial court.

The record is not very satisfactory, and, accordingly, a determination of the issues presented is attended with considerable difficulty.

The trial court was of opinion that appellee had established that the involved merchandise was neither lace nor lace articles, within the purview of paragraph 1529 (a), *supra*, and, after a careful consideration of the record, we are unable to say that its decision is erroneous.

The testimony was carefully analyzed in the quoted decision of the trial court, and we deem it unnecessary to enter upon a further discussion of it.

For the reasons stated, the judgment is *affirmed*.